John L. MERCER, a minor, Individually, et al., Appellants,

v.

The BOARD OF TRUSTEES, NORTH FOREST INDEPENDENT SCHOOL DISTRICT, et al., Appellees.

No. 1302.

Court of Civil Appeals of Texas, Houston (14th Dist.).

June 2, 1976.

Rehearing Denied June 23, 1976.

Michael T. Donohue, Patricia Ann O'Kane, Houston, for appellants.

William E. Junell, Jr., Reynolds, White, Allen & Cook, Houston, for appellees.

J. CURTISS BROWN, Chief Justice.

This is a suit challenging the validity of a public school hair-length regulation.

John L. Mercer (Mercer or appellant), through his parents as next friends, brought suit in the district court against the Board of Trustees of the North Forest Independent School District (School District or appellees) to enjoin the enforcement of a School District regulation that restricted the length to which male students could wear their hair. After a hearing the trial court denied Mercer's application for temporary injunction, and he has perfected this appeal.

On August 21, 1975 Mercer was suspended from school for being in violation of the hair-length regulation. He asserts that inasmuch as the regulation applies only to male students and not to female students it is violative of article I, § 3a of the Texas Constitution. This provision, adopted in 1972 and commonly known as the Texas Equal Rights Amendment (hereinafter referred to as the ERA), reads as follows:

"Section 3a. Equality under the law shall not be denied or abridged because of sex, race, color, creed, or national origin. This amendment is self-operative."

Unheard of until a few years ago, cases challenging the validity of hair-length regulations and dress codes are now legion. See Annot., 14 A.L.R.3d 1201 (1967, Supp.1975); Comment, *Long Hair and the Law*, 24 Kan. L.Rev. 143 (1975); 84 Harv.L.Rev. 1702 (1971). Appellees cite numerous federal cases that uphold such regulations and urge that we follow their reasoning. We decline to base our decision on the holdings of the federal courts for two reasons. First, the federal circuits are split on the issue of hair-length regulations. The First [1],

1. *Richards v. Thurston*, 424 F.2d 1281 (1st Cir. 1970).

Second[2], Fourth[3], Seventh[4], and Eighth[5] Circuits have been receptive to challenges of such regulations. The Fifth[6], Sixth[7], Ninth[8], Tenth[9], and District of Columbia[10] Circuits have not been so hospitable to similar claims. The position of the Third Circuit is presently unclear[11]. Considering the divergent views of the various circuits, "avoidance of the federal thicket is the better course." *Breese v. Smith,* 501 P.2d 159, 166 (Alas.1972). State cases on the question are also divided. See Annot., 14 A.L.R.3d 1201 (1967, Supp.1975); *Breese v. Smith, supra* at 165.

Second, and perhaps more important, the present claim is based on a provision of the Texas Constitution that is not contained in the United States Constitution. Federal courts have dealt with hair-length claims based on the first amendment, ninth amendment, equal protection and due process clauses of the fourteenth amendment, and the right of privacy[12], but we have found no such claim, federal or state, that has ever been based on an ERA. Therefore, appellants' claim must stand or fall on an interpretation of the ERA contained in the Constitution of the State of Texas.

Cases interpreting the Texas ERA are few in number, and their holdings are limited in scope. For instance, it has been stated that under the ERA the duty of the spouses to support their minor children is equal. *Cooper v. Cooper,* 513 S.W.2d 229 (Tex.Civ.App.—Houston [1st Dist.] 1974, no writ). In an action brought by the mother to gain custody of a minor child, the father may properly be allowed attorney's fees from the mother on the theory that such fees are "necessaries". *Perkins v. Freeman,* 501 S.W.2d 424 (Tex.Civ.App.—Beaumont 1973), rev'd on other grounds, 518 S.W.2d 532 (Tex.Sup.1974). Likewise, in a divorce action such factors as disparate earning capacities, business opportunities, and ability may justify the recovery of attorney's fees by the husband rather than the wife. *Lipshy v. Lipshy,* 525 S.W.2d 222 (Tex.Civ.App. —Dallas 1975, writ dism'd). Where the duties of a "patrolman" and a "patrolwoman" were different, and the plaintiff had applied for patrolwoman and never been denied employment as a patrolman, ordinances setting up such classifications were held not to violate the plaintiff's rights to equal protection under the United States and Texas Constitutions. *Turner v. City of*

2. *Kamerling v. O'Hagan,* 512 F.2d 443 (2d Cir. 1975); *Dwen v. Barry,* 483 F.2d 1126 (2d Cir. 1973). *But see Kelley v. Johnson,* —— U.S. ——, 96 S.Ct. 1440, 47 L.Ed.2d 708, 44 U.S. L.W. 4469 (1976).

3. *Long v. Zopp,* 476 F.2d 180 (4th Cir. 1973); *Massie v. Henry,* 455 F.2d 779 (4th Cir. 1972).

4. *Holsapple v. Woods,* 500 F.2d 49 (7th Cir. 1974), *cert. denied,* 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1975); *Arnold v. Carpenter,* 459 F.2d 939 (7th Cir. 1972).

5. *Bishop v. Colaw,* 450 F.2d 1069 (8th Cir. 1971) (public school regulation). The Eighth Circuit has upheld hair-length regulations where they concerned police departments or prisons. *See Stradley v. Andersen,* 478 F.2d 188 (8th Cir. 1973) (police department); *Rinehart v. Brewer,* 491 F.2d 705 (8th Cir. 1974) (prison).

6. *Karr v. Schmidt,* 460 F.2d 609 (5th Cir.) (court en banc divided 8–7), *cert. denied,* 409 U.S. 989, 93 S.Ct. 307, 34 L.Ed.2d 256 (1972). *But cf. Lansdale v. Tyler Junior College,* 470

F.2d 659 (5th Cir. 1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2268, 36 L.Ed.2d 964 (1973).

7. *Gfell v. Rickelman,* 441 F.2d 444 (6th Cir. 1971); *Jackson v. Dorrier,* 424 F.2d 213 (6th Cir.), *cert. denied,* 400 U.S. 850, 91 S.Ct. 55, 27 L.Ed.2d 88 (1970).

8. *King v. Saddleback Junior College Dist.,* 445 F.2d 932 (9th Cir.), *cert. denied,* 404 U.S. 979, 92 S.Ct. 342, 30 L.Ed.2d 294 (1971) and 404 U.S. 1042 (1972).

9. *Hatch v. Goerke,* 502 F.2d 1189 (10th Cir. 1974); *Freeman v. Flake,* 448 F.2d 258 (10th Cir. 1971), *cert. denied,* 405 U.S. 1032, 92 S.Ct. 1292, 31 L.Ed.2d 489 (1972).

10. *Fagan v. National Cash Register Co.,* 157 U.S.App.D.C. 15, 481 F.2d 1115 (D.C.Cir. 1973).

11. *Compare Stull v. School Board,* 459 F.2d 339 (3d Cir. 1972), *with Zeller v. Donegal School Dist. Bd. of Educ.,* 517 F.2d 600 (3d Cir. 1975).

12. *See* Comment, *Long Hair and the Law, supra; Breese v. Smith, supra* at 165–66.

*Baytown,* 516 S.W.2d 270 (Tex.Civ.App.— Houston [14th Dist.] 1974, no writ). A college rule requiring undergraduate female students—but not male students—under the age of 23 to live in on-campus dormitories was held to violate the ERA. *Texas Woman's University v. Chayklintaste,* 521 S.W.2d 949 (Tex.Civ.App.—Fort Worth), rev'd on other grounds, 530 S.W.2d 927 (Tex.Sup.1975). Recently, the court of criminal appeals upheld the constitutionality of the Texas rape statute [13]. *Finley v. State,* 527 S.W.2d 553 (Tex.Crim.App.1975).

With so little precedent on which to rely it is appropriate that we examine the manner in which other jurisdictions have handled the same or similar problems. In reviewing legislation under the equal protection clause of the fourteenth amendment, the United States Supreme Court has used two primary standards of review. Under the first standard, permissive review, a law which classifies persons for different treatment will be upheld so long as there is some rational basis for the classification; i. e., so long as the classification is "reasonable, not arbitrary, and . . . rest[s] upon some ground of difference having a fair and substantial relation to the object of the legislation . . . ." *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971). Under the second standard, active or strict review, the classification will be upheld only if the governmental body makes a showing of a compelling interest to justify the classification. *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Strict review is triggered either by laws which affect certain "fundamental rights" (such as voting, travel, and procreation) or which provide for different treatment of persons on the basis of a "suspect classification" (such as race, alienage, and national origin).

■ We think this two-tiered approach, while by no means an ideal system, is an

appropriate method by which to determine the constitutionality of laws under the ERA. We therefore adopt it in the present case. The next question, then, becomes whether or not sex-based classifications are suspect under the Texas ERA.

In *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), four members of the United States Supreme Court joined in a plurality opinion that held sex-based classifications to be suspect under the fourteenth amendment and require strict judicial scrutiny. Though the Court has since retreated from that stand [14], Justice Powell's concurring opinion in *Frontiero,* in which Chief Justice Burger and Justice Blackmun joined, is significant:

"There is another, and I find compelling, reason for deferring a general categorizing of sex classifications as invoking the strictest test of judicial scrutiny. *The Equal Rights Amendment, which if adopted will resolve the substance of this precise question,* has been approved by the Congress and submitted for ratification by the States. If this Amendment is duly adopted, it will represent the will of the people accomplished in the manner prescribed by the Constitution. By acting prematurely and unnecessarily, as I view it, the Court has assumed a decisional responsibility at the very time when state legislatures, functioning within the traditional democratic process, are debating the proposed Amendment." 411 U.S. at 692, 93 S.Ct. at 1773 (emphasis added).

Thus, while four members of the Court felt that sex-based classifications required strict review under the equal protection clause of the fourteenth amendment, three others took for granted that adoption of the federal ERA would require it.

The constitutions of at least twelve other states besides Texas contain an ERA or its equivalent [15]. Three of these states have

---

**13.** Tex.Penal Code Ann. § 21.02 (1974).

**14.** *See Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974).

**15.** Colo.Const. art. II, § 29; Conn.Const. art. I, § 20; Hawaii Const. art. I, § 4; Ill.Const. art. I,

§ 18; Md.Const., Declaration of Rights, art. 46; Mont.Const. art. II, § 4; N.M.Const. art. II, § 18; Pa.Const. art. I, § 28; Utah Const. art. IV, § 1; Va.Const. art. I, § 11; Wash.Const. art. 31, § 1; Wyo.Const. art. I, § 3.

interpreted their constitutional provision as requiring strict judicial review of sex-based classifications. See *People v. Green,* 183 Colo. 25, 514 P.2d 769 (1973); *People v. Ellis,* 57 Ill.2d 127, 311 N.E.2d 98 (1974); *Hanson v. Hutt,* 83 Wash.2d 195, 517 P.2d 599 (1973). Two states have applied permissive review in sex-discrimination cases. See *Stanton v. Stanton,* 30 Utah 2d 315, 517 P.2d 1010 (1974), rev'd, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975); *Archer v. Mayes,* 213 Va. 633, 194 S.E.2d 707 (1973). The courts of one state, Maryland, have apparently divided on the issue. Compare *Maryland State Board of Barber Examiners v. Kuhn,* 270 Md. 496, 312 A.2d 216 (1973), with *Brooks v. State,* 24 Md.App. 334, 330 A.2d 670 (1975). Another state, Pennsylvania, has adverted to the issue but has yet to make a definitive holding. See *Commonwealth v. Butler,* 458 Pa. 289, 328 A.2d 851, 858 (1974). It should be noted, however, that the Pennsylvania Supreme Court has used unqualified language in referring to the effect of its ERA: "In this Commonwealth, sex may no longer be accepted as an exclusive classifying tool." *Id.* 328 A.2d at 855; accord, *Henderson v. Henderson,* 458 Pa. 97, 327 A.2d 60 (1974); *Commonwealth v. Pennsylvania Interscholastic Athletic Association,* 18 Pa.Cmwlth. 45, 334 A.2d 839 (1975).

One of the most thorough and well-reasoned opinions came from the Supreme Court of Washington in the recent case of *Darrin v. Gould,* 85 Wash.2d 859, 540 P.2d 882 (1975). The case involved a claim of illegal discrimination against girls in the field of high school interscholastic football competition. In striking down the school district's regulation the court went beyond its previous holding in *Hanson v. Hutt, supra,* and concluded that their ERA's prohibition of sex discrimination was an absolute one:

"In the absence of Const. art. 31, it might have been argued (as in the case of the Fourteenth Amendment and Const. art. 1, § 12) sex classifications are valid if they bear a rational relationship to the purpose of the classifications especially if they survive the strict scrutiny test.

Whatever doubts on that score might have been formerly entertained, Const. art. 31 added something to the prior prevailing law by eliminating otherwise permissible sex discrimination if the rational relationship or strict scrutiny tests were met.

When the Darrin girls were denied permission to play in the fall of 1973, Const. art. 31, § 1, Washington's Equal Rights Amendment provided:

Equality of rights and responsibility under the law *shall not* be denied or abridged on account of sex. (Italics ours.)

Const. art. 31, provided the latest expression of the constitutional law of the state, dealing with sex discrimination, as adopted by the people themselves. Presumably the people in adopting Const. art. 31 intended to do more than repeat what was already contained in the otherwise governing constitutional provisions, federal and state, by which discrimination based on sex was permissible under the rational relationship and strict scrutiny tests. Any other view would mean the people intended to accomplish no change in the existing constitutional law governing sex discrimination, except possibly to make the validity of a classification based on sex come within the suspect class under Const. art. 1, § 12. . . . Had such a limited purpose been intended, there would have been no necessity to resort to the broad, sweeping, mandatory language of the Equal Rights Amendment. *See* Comment, *Sex Discrimination in Interscholastic High School Athletics,* 25 Syracuse L.Rev. 535, 570–74 (1974).

The Federal Equal Rights Amendment (now ratified by 34 of the 38 states needed to make it effective) whose purpose is to render illegal action by states permitting discrimination based on sex, . . . was intended to outlaw interpretations of the Equal Protection and Due Process Clauses that permitted exceptions to the prohibition against sex discrimination." 540 P.2d at 889–90.

We also note that commentators who have written on the subject have uniformly concluded that at the very least strict review should be used under an ERA. See, e. g., Note, *Sex Discrimination and Equal Protection: Do We Need a Constitutional Amendment?* 84 Harv.L.Rev. 1499 (1971); Brown, Emerson, Falk, and Freedman, *The Equal Rights Amendment: A Constitutional Basis for Equal Rights for Women,* 80 Yale L.J. 871 (1971); Comment, *An Overview of the Equal Rights Amendment in Texas,* 11 Hous.L.Rev. 136 (1973); Comment, *Barefoot and Pregnant—Still: Equal Protection for Women in Light of Geduldig v. Aiello,* 16 S.Tex.L.J. 211 (1975); 7 Tex. Tech.L.Rev. 724, 729 (1976).

■ We cannot agree with the Supreme Court of Washington that the ERA admits of no exceptions to its prohibition of sex discrimination. Any classification based upon sex is a suspect classification, and any law or regulation that classifies persons for different treatment on the basis of their sex is subject to strictest judicial scrutiny. Any such classification must fall unless the party defending it can show that it is required by (1) physical characteristics, (2) other constitutionally protected rights such as the right of privacy, or (3) other "compelling reasons." With respect to "physical characteristics" we are simply recognizing the facts of life. For us to adjudicate that women are men would be as futile as it would be absurd. Neither the ERA nor the rights established by it require us to construe it so as to deny sexual or reproductive differences between the sexes. Nor does the ERA require that such rights so established (and so long denied) be enforced where they come into conflict with other basic fundamental constitutionally-protected rights such as that of privacy. To justify a suspect classification by "compelling reasons" places the burden of proof and persuasion on the party defending the classification.

■ In considering the dress code in the context of the present case we recognize that juveniles have been afforded certain constitutional rights. See, e. g., *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). However, children are in a formative period of their lives wherein their values are being established by parents, church, and school. All may reasonably establish rules of conduct arising out of the relationship without intervention of the courts. The schools stand somewhat *in loco parentis* to the child. Living by rules, sometimes seemingly arbitrary ones, is the lot of children. School is of necessity made up of "rules." They establish the time for beginning class, recess, exercise, study periods, outside assignments, athletic activities, playground conduct, use of parking and other school facilities such as lockers—all inexorably intertwined with academic, personal, artistic, and cultural pursuits. See *Karr v. Schmidt,* 460 F.2d 609, 615–16 (5th Cir. 1972). The school-yard fight requires immediate intervention and disciplinary action. To require warning of constitutional rights, the right to summon and examine witnesses, the aid of counsel and a full evidentiary hearing with regard to a schoolhouse fracas would place our constitutional rights and freedoms in disrepute rather than protect them.

■ Court intervention is simply not a suitable device with which to enforce some rights. Others beside the judiciary are charged with following the dictates of our constitutions. We must be wise enough to perceive that constant judicial intervention in some institutions does more harm than good. We believe that there are some areas in which our intervention does not offer a practical solution. We make this observation in full sympathy with Judge Wisdom's statement in his dissent in *Karr v. Schmidt, supra* at 619: "Individual rights never seen important to those who tolerate their infringement." However, in this case we find our heavy hand ample reason for withholding it.

The trial court did not abuse its discretion in refusing to intervene in this dispute by granting the equitable writ of injunction.

Affirmed.